United States Bankruptcy Court
Eastern District of Michigan
Southern Division

In re:
Christopher Lawrence Hayes,                                    Case No. 10-58136-R
                              Debtor.                          Chapter 7
_____/

Christopher Lawrence Hayes,
                              Plaintiff,

v.                                                             Adv. No. 10-6573

Internal Revenue Service,
Department of Treasury,
                              Defendant.
_____/


Opinion Regarding Cross-Motions for Summary Judgment

        The debtor, Christopher L. Hayes, filed this adversary proceeding to contest assessments by

the Internal Revenue Service of "trust fund recovery penalties" under 26 U.S.C. § 6672. On October

5, 2009, the IRS assessed $60,993.98 against the debtor because the debtor's former company, PC

Landscape Services, Inc., failed to pay to the IRS the Federal Insurance Contributions Act ("FICA")

taxes and federal income taxes withheld from the wages of its employees during the ten quarters

ending September 30, 2006, through December 31, 2008.

        The debtor moves for summary judgment declaring him not liable for any of the taxes

incurred during the ten quarters at issue. The IRS has moved for partial summary judgment for the

first seven tax quarters ending on September 30, 2006 through March 31, 2008.

                                              I.

        In 2003, the debtor and his brother, Paul Hayes, started PC Landscaping Services, Inc. ("PC

Landscaping"), a successor company to P & C Landscaping, a company they founded in 1986. Paul Hayes served as the president, while the debtor served as the vice president and treasurer. Both served as the sole directors and were 50% shareholders. PC Landscaping took over P & C Landscaping's Christian Financial Credit Union (CFCU) bank account. PC Landscaping also opened a corporate account with Huntington National Bank with both Paul Hayes and the debtor as authorized signatories.

In July 2006, PC Landscaping began to experience cash flow problems. As a result, it began to fall behind on its payroll tax payments. Because the business was no longer able to support both the debtor and his brother, the debtor sought other employment.

The debtor obtained a job with Butler International, a government contractor, which required him to work in the Middle East. The debtor began working in the Middle East in late February of 2007. Prior to his departure, the debtor executed a will and gave power of attorney to his wife, Donna Hayes.

From March 2007 through October 2007, the debtor worked in Iraq and Kuwait. The debtor returned to the United States from November 2007 through March 2008. During this period, the debtor split his time working for Butler International in both Michigan and Texas. In April 2008, the debtor returned to the Middle East, where he currently works.

In August 2009, Paul Hayes ceased doing business under the name PC Landscaping and started another landscaping company called Green Valley Conservation Services, Inc. PC Landscaping's remaining assets were transferred to Green Valley. The debtor has no ownership interest in this new entity.

On April 28, 2009, the IRS assessed the debtor $60,993.98 for unpaid payroll taxes for PC

Landscaping. As a result, the IRS setoff approximately $22,021 from the debtor's tax returns for 2007-2009.

On June 2, 2010, the debtor filed for bankruptcy under Chapter 7. On August 31, 2010, the debtor filed the instant adversary proceeding against the IRS for the return of setoff funds and a declaratory ruling that the debtor is not responsible for PC Landscaping's payroll taxes.

II.

The debtor asserts that he resigned his position at PC Landscaping in early 2007, shortly after he started working for Butler International. He contends that after he left for the Middle East, Paul Hayes assumed total control of the business and he was no longer a responsible person. The debtor further argues that any failure to pay payroll taxes that were incurred prior to February 2007 was not willful because he was not aware that these taxes had not been paid.

The IRS contends that the debtor retained his position at PC Landscaping even after he began working in the Middle East, and that he remained a responsible party, even if he was not involved in day-to-day management. The IRS further asserts that the debtor only now denies his post-February 2007 affiliations with PC Landscaping as a result of these proceedings.

III.

26 U.S.C. § 6672 provides, in part:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672.

3

In *Gephart v. United States*, 818 F.2d 469 (6th Cir. 1987), the Sixth Circuit explained the

requirements for liability under this section:

> Section 6672 provides that "any person" who willfully fails
> to account for and pay over withholding taxes shall be liable for the
> full amount not paid over to the government. Liability attaches if an
> individual meets two requirements. He must be a "responsible
> person" under the statute, and he must "willfully" fail to pay over to
> the government the amount due. Congress enacted section 6672 to
> protect the government against losses by providing it with another
> source from which to collect the withheld taxes.

*Id.* at 473 (citations omitted).

"The taxpayer bears the burden of proving that he is not a responsible person under section

6672 and that he did not act willfully in failing to pay over the taxes." *Kinnie v. United States*, 994

F.2d 279, 283 (6th Cir. 1993), citing *McDermitt v. United States*, 954 F.2d 1245, 1251 (6th Cir.

1992).

In *Gephart,* the Sixth Circuit explained the test for responsibility:

> It is well established that the test for determining the
> responsibility of a person under § 6672 is essentially a functional one,
> focusing upon the degree of influence and control which the person
> exercised over the financial affairs of the corporation and,
> specifically, disbursements of funds and the priority of payments to
> creditors.
>
> . . .
>
> Among the specific facts which courts have relied upon in
> determining whether individuals were persons responsible for the
> payment of taxes withheld from the wages of employees are: 1) the
> duties of the officer as outlined by the corporate by-laws; 2) the
> ability of the individual to sign checks of the corporation; 3) the
> identity of the officers, directors, and shareholders of the corporation;
> 4) the identity of the individuals who hired and fired employees; and
> 5) the identity of the individuals who were in control of the financial
> affairs of the corporation.

4

*Id.* at 473 (citations omitted).

> A person's duty to remit withholding payments to the government "must be viewed in light of his power to compel or prohibit the allocation of corporate funds. It is a test of substance, not form." *Godfrey v. United States*, 748 F.2d 1568, 1576 (Fed. Cir. 1984). Any corporate officer or employee with the power and authority to avoid default in payments is a responsible person under Section 6672. *Feist v. United States*, 607 F.2d 954, 960 (Ct. Cl. 1979). As stated in *Gephart*: "Essentially, liability is predicated upon the existence of significant, as opposed to absolute, control of the corporate finances." 818 F.2d at 473. The inquiry involves determining the persons who had the authority to control the process by which the employer decided to allocate funds to creditors in preference to its withholding obligations to the government. *Godfrey*, 748 F.2d at 1575.

*Cline v. U.S.*, 1993 WL 272516, at *3 (6th Cir. 1993).

> Willfulness is established, for purposes of Section 6672, if a responsible person makes a voluntary, knowing and intentional choice to pay creditors other than the government or engages in a course of conduct with a reckless disregard as to whether the taxes are paid to the government. *Collins*, 848 F.2d at 742; *Calderone v. United States*, 799 F.2d 254, 259-60 (6th Cir. 1986). No intent to defraud or deprive the United States of taxes withheld from wages need be proven, nor bad or evil motive be present, in order to impose Section 6672 liability. *McGlothin v. United States*, 720 F.2d 6, 8 (6th Cir. 1983).

*Cline* at *4.

Willfulness is often a question of fact. *Honey v. United States*, 963 F.2d 1083, 1087 (8th Cir. 1992). However, proof that a responsible person had knowledge of payments to other creditors, including employees, after he was aware of the failure to pay over withholding taxes is proof of willfulness as a matter of law. *Luce v. Luce*, 119 F. Supp. 2d 779, 785 (S.D. Ohio 2000).

## IV.

The relevant tax periods are July 2006 through February 2007, prior to the debtor's departure

to the Middle East; March 2007 through March 2008, during which time the debtor returned to the United States for part of the time; and April 2008 to December 2008.

## A. July 2006 through February 2007

There is no dispute that the debtor was a responsible party between July 2006 and February 2007. However, the debtor argues that he is not liable for the payroll taxes incurred during this period because he lacked willfulness. The debtor testified that he was not aware that PC Landscaping was behind on payroll taxes until June or July of 2007. (See Dkt #97-1 at 27; Dkt #97-2 at 11). However, he contradicted this testimony by later testifying that there were times when he did knew there was not enough money to make the payroll tax deposit. (Dkt. #97-1 at 23). In addition, to support his position that there was no willfulness, the debtor insists that he was not aware that payroll tax checks had been voided until after he had already left for the Middle East. This position conflicts with the debtor's later testimony that after he left the company, he only discussed the business in general terms with his brother. (See Dkt #97-2 at 11-12).

While the debtor repeatedly claimed ignorance, he seemed reluctant to place the entire responsibility on his brother:

Q. P.C. Landscape Services, Inc. began to get behind on its payroll tax deposits during the third quarter of 2006, is that correct?

A. I found out later that that was happening.

Q. So you weren't aware, during the third quarter of 2006, that P.C. Landscaping Services, Inc. was not making current payroll tax deposits?

A. I wasn't sure. Checks were made and checks were signed and a lot of times, with me being out in the field, if they were put towards the Huntington Bank, you know, Paul dealt with Marian most

6

of the time. . . .

(Dkt #97-1 at 18-19)

Q. Right. And my question is, were you involved in the decision not to make those payment?

A. No. I made some payments. I thought some of the others were paid and I found out the checks were voided and were not paid. I didn't find this out till after I left, because after December the books go to the accountant. I was already in Iraq. . . .

Q. So Paul Hayes was entirely responsible for the decision not to make current payroll tax deposits between July 2006 and when you left in February 2007, is that correct?

A. I thought he made the payments. If I didn't see them and they were not brought to my attention by March, I didn't know or I thought they were paid.

. . .

A. Between July 2006 and February 2007, if I was there and I signed the check and I took it to Huntington Bank, the taxes got paid. If the check wasn't brought to my attention that it needed to be paid, if I didn't see the check on my desk, I figured it was already paid.

(Dkt #97-1 at 20-22)

Q. And you testified that it would not have been your decision not to deposit this [payroll tax] check, is that correct? That would have been Paul's decision?

A. If he decided the money needed to be paid for other things, yes.

(Dkt #97-2 at 9)

However, in Paul Hayes' deposition, Paul testified that prior to the debtor's departure, the two of them had made all decisions jointly:

Q. And before he left in February of 2007, was he involved in decisions to pay PC Landscape's

7

employees but not to pay the IRS the withholding taxes?

A. Yeah, I'd say we both were, yes.

(Dkt #97-13 at 14)

Q. And who paid the payroll taxes to the IRS before February 2007?

A. Me and Chris, again. Both of us would sit down and write checks to every vendor we owed

money to, whether it be the IRS or any other vendors.

Q. So would you actually have a period of time where you were both sitting down --

A. We tried to make it a weekly thing. We sat down every week to do that.

Q. And what day of the week was it?

A. It varied because of the workload. It could be Sundays; it could be Friday. It just depended --

if it was a rain day, we'd take a rain day and do it.

(Dkt #97-13 at 19-20)

Q. And you both felt before February 2000 -- between July 2006 and February 2007 you both felt

that there were insufficient funds to pay the IRS at that time; is that correct?

A. Correct.

(Dkt #97-13 at 25)

        In her deposition, Marion Krafft testified to the same effect:

Q. Who within the company made the decision not to pay the IRS?

A. It was both of them actually, because I would do the tax thing, and then I'd say, hey, you have

to pay that. Oh, we don't have no money for that this week.

(Dkt #97-17 at 13)

        Krafft also testified that in the period leading up to February 2007, she prepared payroll tax

8

deposit slips weekly, and gave them to either Paul or Chris, who would then decide whether to sign and deposit them. Krafft also testified that she voided many of the deposit slips when she prepared the quarterly state and unemployment tax reports so that the accounts would reconcile. (Dkt #97-17 at 18-19).

The differing accounts of how decisions were made in the company prior to February 2007 suggest that the debtor's testimony is not entirely credible.

However, even assuming the debtor had no actual knowledge that PC Landscaping did not make all payroll taxes, his behavior easily meets the standard for recklessness. According to his testimony, the debtor merely assumed, without good reason, that the tax payments were made at a time when PC Landscaping was experiencing severe cash flow issues. Indeed, the debtor testified that on many occasions there was no money left to pay Paul or himself. (Dkt. #97-1 at 19).

Accordingly, it is appropriate to grant summary judgment finding the debtor liable for payroll taxes incurred during tax periods ending in September and December 2006.

B. March 2007 through March 2008

Although the debtor took a new job and left for the Middle East in February 2007, the IRS contends that he remained a responsible part of the company.

The debtor contends that after he left PC Landscaping, he relinquished all involvement with the company, and therefore he was not a responsible person under § 6672. Much of the debtor's testimony pertaining to the period following February 2007 is substantially corroborated by Paul Hayes, Krafft, and Michael Sloan, a supervisor at PC Landscaping.

Sloan, Krafft and Paul Hayes all testified that the debtor was no longer involved with the company after February 2007.

Sloan's testimony is:

Q. And did he remain involved in the business as far as you could tell after he left?

A. As far as I can tell, no. I don't believe he was part of the business. . . .

(Dkt. #72 at 14-15)

Q. And did you discuss the business with Chris Hayes after he left for the Middle East?

A. No, never.

(Dkt. #72 at 20)

Krafft's testimony is:

Q. And what role, if any, did you see Chris Hayes play in PC Landscape's business after he left for the Middle East?

A. None that I can recall. Oh, he did come in for a short time when Paul was really busy, and he came back. He came in and signed a few checks for Paul, but other than that --

(Dkt #97-17 at 15-16)

Q. And after Chris Hayes left for the Middle East in February of 2007, did you communicate with him at all about the payroll taxes?

A. Not that I recall.

(Dkt #97-17 at 13)

Paul Hayes' testimony is:

Q. And did you have any agreement as to what his role would be for PC Landscape after February 2007?

A. I believe his role would be nonexistent after that. Once he told me that it would be more full-time than a part-time thing, I knew it wouldn't be at all.

10

(Dkt #97-13 at 29)

The IRS relies on various corporate filings in support of its position that the debtor remained a responsible person. These include PC Landscaping's 2007 federal tax returns which listed the debtor as a 50% shareholder; a 2007 federal tax return for PC Landscaping signed and filed by the debtor on April 15, 2008; an IRS collection information statement filed by Paul Hayes on July 29, 2008, which identified the debtor as a 50% shareholder and responsible party of PC Landscaping's payroll taxes; and PC Landscaping's corporate information update forms for the years 2006 through 2010, filed by Paul Hayes in January 2011, certifying that PC Landscaping's officers and directors had not changed from previous filings.

The debtor testified that he gave full control and ownership of PC Landscaping to Paul over the phone shortly after he began working in the Middle East. He further testified that his name should have been removed from corporate paperwork, and that he expected his brother to have done so. Paul Hayes testified to the same effect.

The debtor's testimony is:

Q. Did you formally resign those positions [at PC Landscaping]?

A. Yes.

Q. How?

A. Verbally to my brother. He was supposed to take my name off everything.

Q. You had asked him to?

A. Yes.

Q. And when had you asked him to take your name off everything?

A. The second week, when I left. We discussed it before I left, if I was going to like

11

it or not and I was asked to stay on a full-time position with Butler.

(Dkt #97-1 at 28)

Paul Hayes' testimony is:

Q. So the arrangement between you and Chris Hayes when he left to go work in the Middle East was that you would manage the business -- you would carry on doing what you had been doing together on your own; is that correct?

A. Yes, correct, because we didn't know how long he would be over there, didn't know what the, you know, what the job entailed as far as length goes, so we didn't prepare anything else besides him leaving town. We didn't know if we should have filed a separate paper to take him off the tax records and so on, so forth. That was my fault. I probably should have been a little more diligent in doing so.

Q. So you didn't -- he didn't resign as a director of PC Landscape when he left; is that correct?

A. Not paper-wise, no, but verbally-wise, yes.

Q. And did he give up his 50 percent equity interest in the company?

A. Yes.

Q. How did he do that?

A. Just verbally-wise. Again, when he found out that his job would be more than a temporary thing, at that point in time, he said pretty much that he knew that he wouldn't be coming back to PC Landscape.

(Dkt #97-13 at 27-28)

Q. When he left for the Middle East in 2007, did Chris Hayes formally resign as an officer of PC Landscape?

A. Not formally. Again, we didn't know it would be a part-time or full-time thing yet, so we

actually didn't go into the formal paperwork to do so. We just did it over the phone. He said, hey,

I don't think this is going to be a part-time thing; it's going to be more of a full-time thing. I don't

know how long I'm going to be here, but pretty much it's all yours, do what you can with it. If you

can make it work, flip it around, turn it around, do so. If you can't, then sell it and get out.

(Dkt #97-13 at 30)

The IRS relies on the debtor's continued check writing authority as further evidence that he

was a responsible party during this period. The debtor admits that he wrote and signed several

checks during this period. However, he argues that these checks were all prepared at Paul Hayes'

direction and as a favor to him. He denies that he retained any discretion about which payments to

make:

Q. When you returned to the U.S. from the Middle East between February of 2007 and December

of 2008, you had the ability to distribute funds on behalf of P.C. Landscape Services Inc., is that

correct?

. . .

A. If Paul instructed me to write a check to someone, he knew what was in the account, I didn't. I

would do it on his behalf.

Q. And could you also have made out checks to whomever you wanted?

A. No, because he didn't instruct me to.

Q. Why were you beholden to his instructions?

A. Because at that point, I had already relinquished my assets to P.C. Landscape. And he was

solely in control of them. I was not. If he instructed me to write a check to somebody, I write it for

that amount that he instructed me to write it for.

(Dkt #97-2 at 33-34).

Paul Hayes also testified that the debtor only came back to the office a few times to say "hi" to people and to sign some checks as a favor to him and at his direction if he wasn't available. (Dkt #97-13 at 35, 38; Dkt #97-14 at 15-16).

Krafft also testified that she saw the debtor rarely (only once) after he left for Iraq. (Dkt #97-17 at 24).

The IRS also points to a checking authorization form that the debtor signed on February 22, 2007. The form added Sloan as a signatory on PC Landscaping's CFCU checking account, but did not remove the debtor. This, the IRS contends, undermines the debtor's claim that he relinquished ownership and control of the company.

The debtor testified that he remained as a signatory "because of [Paul] being divorced if something ever happened to him, my name would just be on it to handle anything if something happened to him or me, I guess." (Dkt #97-1 at 30). Paul Hayes testified that Mike Sloan was added as a safety precaution in case anything happened to him, and that the debtor was left on the account because they did not know if the debtor's new job would be permanent or temporary at that time. Paul Hayes testified that after learning that the debtor's new job would be permanent, he forgot to remove the debtor as a signatory. (Dkt. #97-14 at 3-4).

Sloan testified that he was added so that he could pay for materials when neither brother was available, but did not recall that it was related to the debtor's departure from the company. (Dkt. #72 at 13).

Consistent with the debtor's assertion that he was no longer involved with the business of

14

PC Landscaping after February 2007, Paul Hayes testified that he alone made all financial and tax related decisions after February 2007:

Q. And who made decisions about which bills of PC Landscape to pay?

A. That was me.

Q. And did you have any discussions with Chris Hayes after he left about the unpaid payroll tax of PC Landscape?

A. I don't believe I talked to him about anything like that for -- business-wise.

(Dkt #97-13 at 32)

Q: And whose decision was it to make the payroll but not to pay the withholding taxes to the IRS?

A. Well, I'm assuming it was mostly mine. I mean, I was in charge of it, so --

Q. And was there anyone else involved in that decision?

A. Once Chris left in February of '07, it was all on me.

(Dkt #97-13 at 13-14)

Also consistent with the debtor's assertion that he was no longer involved with the business of PC Landscaping after February 2007, Paul Hayes and the debtor both testified that the substance of their telephone conversations were mostly personal, and that the debtor only inquired about the business to see how Paul was doing personally.

Paul Hayes described their conversations:

Q. And would you discuss PC Landscape on those phone calls?

A. No, mostly my kids, his kids, you know, his wife, see how I was doing, see how the rest of my family was doing, that kind of stuff. We may have briefly -- you know, he may have briefly asked me how business was. That's about it. We didn't go in depth as far as that goes.

15

(Dkt #97-13 at 27).

The debtor described their conversations:

Q. How often did you and Paul discuss P.C. Landscape business while you were in the Middle East

between May of 2007 and December of 2008?

A. Very vaguely. It was mostly personal, how are the kids doing, how he's doing, stuff like that,

how I was doing how's the wife and kids, family stuff, you know, maybe an occasional "things are

bad, getting better," that kind of stuff, nothing in depth.

(Dkt #97-2 at 11-12).

The IRS also relies on various loans from the debtor and/or his wife to PC Landscaping to demonstrate the debtor's continued involvement in the company. The record shows that on November 09, 2007, Donna Hayes transferred $2,500 and $1,000 to PC Landscaping. (Dkt #97-25 at 4). On November 13, 2007, PC Landscaping transferred $3,500 from its CFCU account to Donna Hayes' account in repayment of the loan. *Id.* On November 29, 2007, the debtor loaned an additional $1,200 to the company. (Dkt #97-25 at 9). On November 30, 2007, PC Landscaping transferred $1,200 from its CFCU account to Donna Hayes' account. *Id.*

Finally, the IRS points to a $32,000 check made out to and cashed by the debtor from Huntington Bank on March 24, 2008, as evidence that the debtor had control over corporate finances. The debtor, however, testified that he withdrew the money on Paul Hayes' request, and gave him the funds that same day. (Dkt #97-2 at 21-23). PC Landscaping's CFCU account statement shows that on March 25, 2008, deposits of $27,000 and $1,855 were made into the account. (Dkt #97-31 at 3). The statement also shows that on the same day, $20,000 was transferred from PC Landscaping's CFCU account into an account of Donna Hayes. PC Landscaping's general

ledger referred to the $20,000 payment as loan payment to Hayes. (Dkt #97-32 at 1). On the same ledger, the "loan from Chris Hayes" section shows this transaction to increase the debtor's loan balance by $20,000. (Dkt #97-32 at 1).

The $20,000 transfer appears to be a loan from PC Landscaping to the debtor. It also appears that as of December 31, 2008, the debtor owed PC Landscaping $11,134.82. *Id*.

Although there are slight discrepancies in the testimony, the great weight of the witness testimony is consistent and overwhelmingly supports a finding that the debtor did not have control over PC Landscaping after February 2007.

The factors relied upon by the IRS exist because the debtor was never formally removed from the corporate paperwork after he was no longer involved with the company. The Court concludes that this is insufficient to find that the debtor continued as a responsible person after February 2007.

Accordingly, the Court finds that the debtor was not a responsible party after February 2007. Because the time at which the debtor ceased his role as a responsible party occurred in the middle of a tax period and the parties did not address the issue, the Court will deny summary judgment for the period ending March 2007. The debtor is entitled to summary judgment for the periods ending June 2007 through March 2008.

### C. June 2008 to December 2008

The debtor moves for summary judgment for this period. The IRS contends that summary judgment is not appropriate. Because the Court found that the debtor was no longer a responsible party as of February 2007, the debtor is entitled to summary judgment for the tax periods June 2008

to December 2008.

## V.

The debtor seeks costs and fees against the IRS under 28 U.S.C. § 1927 for unnecessarily and vexatiously commencing a separate suit against the debtor and Paul Hayes in the district court, which alleges the same debt as that claimed in the proof of claim. In addition, the debtor contends that the IRS's jurisdictional challenges were meritless.

The IRS contends that the debtor has already asserted the same grounds in his prior Rule 11 motion for sanctions, which was later withdrawn. The IRS further argues that the Court cannot sanction the United States for filings made in the district court. Thus, the IRS contends, costs and fees should be denied.

The Court agrees with the position of the IRS on this issue and, accordingly, the debtor's request for costs and fees is denied.

## VI.

In conclusion, the IRS is granted summary judgment with respect to the tax periods ending September 30, 2006 and December 31, 2006. The debtor is granted summary judgment for the tax periods ending June 2007 through December 2008. The tax liability for the period ending February 2007 remains to be determined. Within 28 days, the parties shall submit briefs on the issue of the amount of the debtor's liability for the first quarter of 2007 in light of the Court's findings regarding that time period. The Court will then take that issue under advisement without a further hearing.

The debtor's motion for costs is denied.

The Court will enter a final judgment after all issues have been resolved.

18

Not for Publication.


**Signed on December 27, 2011**

                                                     **/s/ Steven Rhodes**
                                                     **Steven Rhodes**
                                                     **United States Bankruptcy Judge**